COURT OF APPEALS OF VIRGINIA

Present: Judges Willis, Fitzpatrick and Senior Judge Hodges
Argued at Alexandria, Virginia

RUSSELL TROSS

v.   Record No. 0828-94-4                    OPINION BY
                              JUDGE JOHANNA L. FITZPATRICK
COMMONWEALTH OF VIRGINIA                   DECEMBER 12, 1995

            FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                  Porter R. Graves, Jr., Judge

        Steven D. Rosenfield (R. Bruce Wiles, on
        briefs), for appellant.

        Richard B. Smith, Assistant Attorney General
        (James S. Gilmore, III, Attorney General, on
        brief), for appellee.


        Russell Tross (appellant) was convicted in a jury trial of

capital murder in violation of Code § 18.2-31(4), robbery in

violation of Code § 18.2-58, and using a firearm to commit murder

in violation of Code § 18.2-53.1.  On appeal, he argues that the

trial court erred in:  (1) exercising jurisdiction over the case

when the juvenile intake system is facially unconstitutional

under the Virginia Constitution's doctrine of separation of

powers; (2) transferring jurisdiction without considering his

amenability to treatment or rehabilitation as a juvenile; (3)

refusing to strike for cause a potential juror predisposed to the

death penalty; (4) denying his motion for a jury view of the

crime scene; and (5) finding the evidence sufficient to support

his convictions for robbery and capital murder.  For the reasons

that follow, we affirm the trial court.

## I. BACKGROUND

On January 22, 1993, at 9:30 p.m., appellant, a sixteen-year-old, and four companions went to the Super Fresh grocery store in Harrisonburg, Virginia. On the way to the store, appellant suggested that they steal some beer. Two people, Clifford Silver (Silver) and Kelly Botkins (Botkins), entered the store. Intending to use his gun if anyone tried to stop them from stealing beer, appellant put the gun in his pocket, "just in case," and followed Silver and Botkins into the store. Silver and Botkins both took beer and left without paying. Appellant hid a forty-ounce bottle of beer in his pocket and began to leave. He walked through the first set of exit doors into the vestibule. Steven Daniel (Daniel), the store manager, blocked appellant's exit by standing between him and the second set of exit doors. Alcohol Beverage Control Board Agent S. O. Decker (Decker), who was investigating underage alcohol purchases at the store, was approaching the store's entrance when he saw appellant raise his right hand and fire a .25 caliber round into Daniel's face. Decker was standing six to eight feet away from the entrance when appellant shot Daniel and never saw Daniel touch appellant. Daniel died shortly thereafter.

Appellant fled with the stolen beer, fired two shots in the direction of the pursuing ABC agents, and sped off in the car with the others. Oran Wood (Wood) testified that, when appellant returned to the car, he had both the gun and a forty-ounce bottle

2

of beer.  A Rockingham County sheriff's deputy arrested appellant a few hours later.  At trial, appellant testified that the gun discharged accidentally when he tried to turn over the gun to Daniel, who had grabbed his hand.

An intake officer of the Juvenile and Domestic Relations District Court for Harrisonburg and Rockingham County filed three petitions against appellant, charging him with capital murder, robbery, and using a firearm to commit murder.  Finding the requirements of Code § 16.1-269(A)[1] satisfied, the juvenile court transferred the case to the Circuit Court of Rockingham County.  The circuit court held a <u>de novo</u> hearing pursuant to Code § 16.1-269(E) and also found the transfer proper under Code § 16.1-269(A).  The court referred the case to a grand jury that returned three indictments against appellant for capital murder, robbery, and using a firearm to commit murder.  In a jury trial, appellant was convicted on all three charges and sentenced to life imprisonment for the capital murder, twenty years for the robbery, and two years for the firearm charge.

## II.  JURISDICTION OF JUVENILE COURT AND SEPARATION OF POWERS

After the intake officer authorized the petitions in this case, appellant moved to quash their issuance.  The juvenile and domestic relations district court denied the motion to quash and found that the statutorily mandated intake process did not

---

[1]Code § 16.1-269 was repealed in 1994.  The juvenile transfer requirements are now contained in Code § 16.1-269.1.

violate the doctrine of separation of powers.  On March 9, 1993, the juvenile judge found as follows:  "[T]he appropriate sections of the Code of Virginia were followed by the intake officer and . . . the statutory framework of the commencement of juvenile petitions is constitutional and was followed in this case as to all three petitions."  After transfer to the circuit court and indictment on all three charges, appellant again moved to quash the indictments on the same ground.  The trial court denied his motion and found the intake system facially constitutional.

Appellant argues that the trial court lacked jurisdiction to try him because the juvenile intake system authorizes an executive branch officer to act in a judicial capacity, thus violating the principle of separation of powers contained in the Constitution of Virginia.  See Va. Const. art. I, § 5 and art. III, § 1.[2]  He contends that juvenile intake officers are executive in nature because:  (1) the Department of Youth and Family Services (the Department)[3] appoints them pursuant to Code

_____

[2]Article I, Section 5 of the Virginia Constitution provides "[t]hat the legislative, executive, and judicial departments of the Commonwealth should be separate and distinct."  Article III, Section 1 of the Virginia Constitution states as follows:

> The legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others, nor any person exercise the power of more than one of them at the same time . . . .

[3]The Commonwealth does not dispute that the Department of Youth and Family Services is an executive agency under Code §§ 2.1-1.1, 2.1-1.2, and 66-1.

4

§ 16.1-233(A); (2) the Department compensates them pursuant to Code §§ 16.1-233(B) and 16.1-238; and (3) they exercise the executive power to investigate and arrest. Additionally, appellant argues that juvenile intake officers possess the judicial power to determine probable cause, authorize the filing of petitions, and issue detention orders, thus creating an overlap in functions that violates the separation of powers doctrine.

In response, the Commonwealth asserts that: (1) any possible defect in the juvenile intake system does not affect the jurisdiction of the juvenile court; (2) an invalidly issued petition would not void appellant's conviction; and (3) the juvenile intake system is constitutional. We hold that the juvenile court properly exercised jurisdiction over appellant's case.

### (A) Juvenile Intake System

The legislature created the juvenile and domestic relations district courts to fulfill certain purposes, including:

> 1. To divert from or within the juvenile justice system, to the extent possible, consistent with the protection of the public safety, those children who can be cared for or treated through alternative programs;
> 2. To provide judicial procedures through which the provisions of this law are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other rights are recognized and enforced;
> 3. To separate a child from such child's parents, guardian, legal custodian or other person standing in loco parentis only when the child's welfare is endangered or it is in

5

the interest of public safety and then only after consideration of alternatives to out-of-home placement which afford effective protection to the child, his family, and the community; and

4. To protect the community against those acts of its citizens which are harmful to others and to reduce the incidence of delinquent behavior.

Code § 16.1-227.  To achieve these goals, Code § 16.1-233(A) authorizes the Director of the Department of Youth and Family Services to "develop and operate . . . probation and other court services for juvenile and domestic relations district courts in order that all children coming within the jurisdiction of such courts throughout the Commonwealth shall receive the fullest protection of the court."  The Director may appoint the necessary Department personnel to aid in the development and operation of court service units.  Code § 16.1-233(A).  The Department pays the salaries of these employees with Department funds.  Code § 16.1-233(B).

In Virginia, two types of probation and court service units exist:  state court service units operated by the Department and local court service units.  Code § 16.1-235.  For both state and local court service units, the chief judge or judges of the juvenile and domestic relations district court may appoint probation officers and related court service personnel from a list of eligible persons certified by the Director or, in local court service units, certified by the local governing body.  Id. In appointing court service personnel, the juvenile court judges

must comply with qualifications and regulations established by the State Board of Youth and Family Services pursuant to Code § 16.1-233(C).  Id.  "No person shall be assigned to or discharged from the state-operated court service staff of a juvenile and domestic relations district court except as provided in Chapter 10 of Title 2.1, nor without the prior mutual approval of the judge thereof and the Director."  Code § 16.1-233(D).  Additionally, pursuant to Code § 16.1-236, in both state and local court service units, the chief judge of the juvenile and domestic relations district court may designate one or more probation officers as supervisors.

Probation and court service personnel in state-operated court service units are state employees paid by the Commonwealth.  Code § 16.1-238.  Local court service unit probation officers and personnel are paid by the county or city, although any county or city complying with minimum standards set by the State Board may seek reimbursement from the Department for up to one-half of the compensation paid.  Id.

In addition to the traditional investigatory and supervisory powers of a probation officer, a juvenile probation officer possesses:  (1) "the authority to administer oaths and take acknowledgements for the purposes of §§ 16.1-259 and 16.1-260 to facilitate the processes of intake and petition," Code § 16.1-237(G); and (2) "the powers of arrest of a police officer and the power to carry a concealed weapon when specifically so

7

authorized by the judge."  Code § 16.1-237(H).  Additionally,

juvenile probation officers known as "intake officers" are

responsible for "[c]omplaints, requests and the processing of

petitions to initiate a case" in the juvenile and domestic

relations district courts.  Code § 16.1-260(A).

Under Code § 16.1-260(A), the filing of a petition that

meets the requirements of Code § 16.1-262 commences any matter

alleged to be within the jurisdiction of the juvenile and

domestic relations district court.  An intake officer "may

authorize a petition to be filed by any complainant having

sufficient knowledge of the matter to establish probable cause

for the issuance of the petition."  Code § 16.1-260(B).  However,

an intake officer may refuse to authorize the filing of a

petition if he or she finds no probable cause for issuing the

petition or the petition is not in the child's best interests.

Id.  If an intake officer refuses to authorize a petition

involving a Class 1 misdemeanor or possible felony, the

complainant has the right to apply to a magistrate for a warrant.

 Code § 16.1-260(D).  After the filing of the petition, the court

must issue a summons to the child if the child is twelve years

old or older and to the child's parents or guardian.  Code

§ 16.1-263.[4]

_____

[4]Other states have similar juvenile intake systems.  For
example, in North Carolina, the Administrative Office of the
Courts has a Division of Juvenile Services that is responsible
for the statewide system of juvenile probation and aftercare
services.  N.C. Gen. Stat. § 7A-289.3 (1987).  The Director of
the Administrative Office of the Courts appoints the

8

## (B) Juvenile Court Jurisdiction

The jurisdiction of the juvenile and domestic relations district courts is set out in Code § 16.1-241. Code § 16.1-241(A)(1) provides that each juvenile and domestic relations district court has exclusive, original jurisdiction over proceedings involving delinquent children, unless the case is transferred to the circuit court. Additionally, the legislature enacted a specific provision dealing with any potential defect in the intake process, providing that "[f]ailure to comply with the [intake] procedures . . . shall not divest the juvenile court of the jurisdiction granted it in § 16.1-241." Code § 16.1-260(G). The filing of a petition pursuant to Code

Administrator for Juvenile Services to head the Division. Id. The Administrator appoints chief court counselors for each district with the approval of each chief district judge and the Director. N.C. Gen. Stat. § 7A-289.4(3) (1987). Each chief court counselor supervises intake services in his or her district. N.C. Gen. Stat. § 7A-530 (1979). The intake counselors in each district screen petitions "alleging that a juvenile is delinquent or undisciplined to determine whether the petition should be filed." N.C. Gen. Stat. § 7A-517(17) (1993).

In Maine, the Department of Corrections has a Division of Probation and Parole that oversees probation and parole services. Me. Rev. Stat. Ann. tit. 34-A, § 5401 (West 1985). The juvenile caseworkers who may request the filing of a petition to commence juvenile delinquency proceedings are employees of the Department. Me. Rev. Stat. Ann. tit. 15, § 3301(1)(C) (West 1989); Me. Rev. Stat. Ann. tit. 34-A, § 5602(1) (West 1985).

Similarly, in Maryland, the Department of Juvenile Justice assigns intake officers to the juvenile courts. Md. Cts. & Jud. Proc. Code Ann. § 3-801(o) (1995). The Secretary of the Department must establish juvenile intake services, provide staff to operate the programs, and supervise the staff. Md. Ann. Code art. 83C, § 2-127 (1989). Intake officers assigned to the juvenile courts determine whether the juvenile court has jurisdiction and authorize the filing of petitions. Md. Cts. & Jud. Proc. Code Ann. § 3-810(c) (1995).

§ 16.1-260(A) is not a jurisdictional prerequisite to the juvenile court acquiring subject matter jurisdiction over a case involving a delinquent child.

Additionally, the Commonwealth contends that the United States Supreme Court's decision in Gerstein v. Pugh, 420 U.S. 103 (1975), resolves this case. In Gerstein, the Supreme Court held that an "illegal arrest or detention does not void a subsequent conviction." 420 U.S. at 119 (citing Frisbie v. Collins, 342 U.S. 519 (1952)). The Florida procedures at issue in Gerstein allowed a prosecutor to charge a defendant by information and detain him pending trial without any independent probable cause determination. Id. at 116. A class action filed by Florida prisoners sought declaratory and injunctive relief under the Civil Rights Act, 42 U.S.C. § 1983. Id. at 106-07.

In dealing with this Fourth Amendment challenge, the Court held that the "prosecutor's assessment of probable cause [was] not sufficient alone to justify restraint of liberty pending trial." Id. at 118-19. "[T]he Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention . . . ." Id. at 126. However, the Court recognized that, "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." Id. at 119 (emphasis added).

10

A majority of state and federal courts have relied on Gerstein in holding that an illegal arrest or detention does not void a subsequent conviction. See, e.g., Seabolt v. Hopper, 240 S.E.2d 57, 58 (Ga. 1977) (defendant arrested pursuant to warrant issued by justice of the peace under an invalid fee system); Tommie v. State, 279 S.E.2d 510, 512 (Ga. Ct. App. 1981) (defendant returned to state under warrant alleging offense other than one for which he was subsequently convicted); Commonwealth v. Sudler, 436 A.2d 1376, 1380 (Pa. 1981) (police failed to include informant's name in affidavits accompanying arrest warrant); Commonwealth v. Owens, 649 A.2d 129, 134 (Pa. Super. 1994) (magistrate not detached and neutral because of quasi-familial relationship with victim), appeal denied, 656 A.2d 118 (Pa. 1995); State v. Schreuder, 712 P.2d 264, 270-72 (Utah 1985) (probable cause statement supporting arrest warrant failed to reveal source of information or any basis for determining the credibility or reliability of the source).

Following the Gerstein analysis, these courts remedy an invalid arrest or detention by excluding evidence derived from the invalid arrest or detention, rather than by granting a new trial or dismissing the charges. Sudler, 436 A.2d at 1380; Owens, 649 A.2d at 134; Schreuder, 712 P.2d at 271. More importantly, these courts have recognized that an illegal arrest or detention does not affect the jurisdiction of the court trying the defendant. Seabolt, 240 S.E.2d at 58; Sudler, 436 A.2d at

11

1380; Schreuder, 712 P.2d at 271-72.  In Schreuder, the Supreme

Court of Utah explained the rationale behind the Gerstein rule:

> [O]nce the risk of illegal detention has
> dissipated, i.e., by the time a trial has
> been held, the protection is no longer
> relevant or necessary because other
> constitutional safeguards have come into
> play.  Under this analysis, the probable
> cause requirement for an arrest warrant
> becomes moot by the time a defendant has been
> convicted because the much more stringent
> requirements of proof at trial have been
> employed to protect the defendant.

712 P.2d at 272.

Additionally, "the power of a court to try a person for

crime is not impaired by the fact that he had been brought within

the court's jurisdiction by reason of a 'forcible abduction.'"

Frisbie v. Collins, 342 U.S. 519, 522 (1952) (Michigan police

officers kidnapped defendant in Illinois in violation of Federal

Kidnapping Act and brought defendant to Michigan for trial).  In

Frisbie, the Supreme Court reasoned that "due process of law is

satisfied when one present in court is convicted of crime after

having been fairly apprized [sic] of the charges against him and

after a fair trial in accordance with constitutional procedural

safeguards."  Id.  The United States Supreme Court reaffirmed

Frisbie in United States v. Alvarez-Machain, 504 U.S. 655, 661-62

(1992).  In Alvarez-Machain, United States officials abducted a

Mexican national and brought him to the United States for trial

in connection with the kidnapping and murder of a United States

Drug Enforcement Administration (DEA) agent and his pilot.  504

U.S. at 657.  The Supreme Court held that the defendant's

12

abduction did not violate the United States-Mexico Extradition Treaty and that his "forcible abduction [did] not therefore prohibit his trial in a court in the United States for violations of the criminal laws of the United States."  Id. at 670.

In Valentine v. Commonwealth, 18 Va. App. 334, 443 S.E.2d 445 (1994), this Court relied on Alvarez-Machain and held that "the alleged defect in the institution of appellant's extradition pursuant to the Interstate Agreement on Detainers [was] not jurisdictional."  Id. at 338, 443 S.E.2d at 447.  Similarly, the Pennsylvania Superior Court applied the Gerstein-Frisbie analysis in a juvenile delinquency proceeding involving a juvenile who was not properly returned to the state for trial pursuant to the Interstate Compact on Juveniles.  See In re Cowell, 364 A.2d 718, 721 (Pa. Super. 1976).

The present situation is analogous to Gerstein and its progeny.  Indeed, the deprivations of Fourth Amendment rights listed in those cases are far more egregious than the violation alleged in the instant case.  Appellant does not assert that the intake officer failed to give a neutral evaluation of the basis underlying the petition nor does he contend that any Fourth Amendment violation occurred.  He concedes that the intake officer did not abuse his statutory powers and thus violate appellant's due process rights.  Indeed, he makes only a facial challenge to the statutory scheme and argues no prejudice or harm.  Thus, even if the intake officer system were

13

unconstitutional, any defects in the petition process would not void appellant's convictions.

### (C) Juvenile Intake System's Constitutionality

Lastly, appellant failed to establish that the juvenile intake system violates the constitutional requirement of separation of powers.

We recognize that, "'[i]n assessing the constitutionality of a statute, we must presume that the legislative action is valid. The burden is on the challenger to prove the alleged constitutional defect.'" Woolfolk v. Commonwealth, 18 Va. App. 840, 848, 447 S.E.2d 530, 534 (1994) (quoting Perkins v. Commonwealth, 12 Va. App. 7, 14, 402 S.E.2d 229, 233 (1991)). "[I]f a reasonable doubt exists as to a statute's constitutionality, the doubt must be resolved in favor of its validity. . . . [C]ourts will declare legislation invalid only when it is 'plainly repugnant to some provision of the state or federal constitution.'" Etheridge v. Medical Ctr. Hosp., 237 Va. 87, 94, 376 S.E.2d 525, 528 (1989) (citations omitted).

In both state and local court service units, the chief judge or judges of the juvenile and domestic relations district courts are involved in the appointment of juvenile probation officers and, thus, intake officers. Code § 16.1-235 authorizes juvenile court judges to appoint probation officers and other court service personnel. Although the Department Director and the State Board are involved in the appointment process, this

14

involvement does not minimize the input of the juvenile court judges. Additionally, under Code § 16.1-233(D), the juvenile and domestic relations district court judges and the Director have equal control over the assignment and discharge of the personnel in state court service units, and the juvenile court chief judges have the power to appoint probation officers to supervisory positions under Code § 16.1-236.

"A primary rule of statutory construction is that courts must look first to the language of the statute. If a statute is clear and unambiguous, a court will give the statute its plain meaning." <u>Loudoun County Dep't of Social Servs. v. Etzold</u>, 245 Va. 80, 85, 425 S.E.2d 800, 802 (1993). We hold that the plain meaning of the statutes involved is that juvenile and domestic relations district court judges have co-appointment and discharge powers over juvenile intake officers in both state-operated and local court service units. Thus, juvenile intake officers are not purely executive officers as appellant contends, but are quasi-judicial in nature.

Additionally, the Supreme Court of Virginia has adopted the "whole power" doctrine in reviewing an alleged violation of the separation of powers. <u>See</u> <u>Winchester & Strasburg R.R. Co. v. Commonwealth</u>, 106 Va. 264, 268-70, 55 S.E. 692, 693-94 (1906); <u>Baliles v. Mazur</u>, 224 Va. 462, 472, 297 S.E.2d 695, 700 (1982). In <u>Winchester & Strasburg Railroad</u>, the Supreme Court stated as follows:

When we speak . . . of a separation of the

15

> three great departments of government, and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link or dependence, the one upon the other, in the slightest degree. <u>The true meaning is that the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments</u>; and that such exercise of the whole would subvert the principles of a free constitution. . . . Indeed there is not a single constitution of any state in the union which does not practically embrace some acknowledgment of the maxim and at the same time some admixture of powers constituting an exception to it.

106 Va. at 270, 55 S.E. at 694 (emphasis added) (quoting <u>Dreyer v. Illinois</u>, 187 U.S. 71, 84 (1902)).

In the instant case, while there is some overlap of executive and judicial functions, juvenile intake officers do not exercise the "whole power" of the judiciary. Although the juvenile intake officers authorize filing petitions to commence juvenile proceedings, the juvenile and domestic relations district court judges control the actual disposition of juveniles before the court. The judicial powers assigned to the juvenile intake officers, such as determining probable cause to invoke the juvenile court's jurisdiction and issuing detention orders, are in accord with the quasi-judicial nature of the intake officers. Such powers are analogous to the duties of magistrates in the adult criminal system. <u>See</u> Code § 19.2-45. Thus, for the foregoing reasons, we hold that the juvenile intake system does

16

not violate the Virginia Constitution's doctrine of separation of powers.

### III. AMENABILITY TO TREATMENT

Next, appellant argues that the trial court erred in refusing to consider his amenability to treatment or rehabilitation as a juvenile when deciding whether to transfer his case to the circuit court. The trial judge found that appellant's "amenability to treatment or rehabilitation as a juvenile [was] not a factor in this proceeding" because of the nature of the charges involved.

In a juvenile transfer hearing, "the trial court's decision whether to transfer jurisdiction will not be reversed absent a showing that its exercise of discretion has been abused." Kluis v. Commonwealth, 14 Va. App. 720, 723, 418 S.E.2d 908, 909-10 (1992). "[W]hen the alleged delinquent act is armed robbery, rape . . . or murder, . . . the court may certify the child without making the [amenability to treatment] finding required by this subdivision." Code § 16.1-269(A)(3)(b) (emphasis added).[5]

---

[5]Code § 16.1-269 was repealed in 1994. Code § 16.1-269.1(B) now provides as follows:

> The court may hold a transfer hearing and certify the juvenile for transfer to the appropriate circuit court without making the finding required by subdivision A 4 if a juvenile fourteen years of age or older is charged with:
> 1. A Class 1 or 2 felony violation of Chapter 4 (§ 18.2-30 et seq.) of Title 18.2 or, if the juvenile is sixteen years of age or older, a Class 3 felony violation of Chapter 4 (§ 18.2-30 et seq.) of Title 18.2

17

"The statute . . . dispenses with the finding that the juvenile is unamenable 'to treatment or rehabilitation' as a prerequisite to transfer in such instances." Novak v. Commonwealth, 20 Va. App. 373, 383, 457 S.E.2d 402, 406-07 (1995) (quoting Code § 16.1-269(A)(3)(b)). "A determination of nonamenability based solely on the [delinquent act] . . . is only permissible when the offense is one of those enumerated in the statute." Hutcherson v. Commonwealth, 7 Va. App. 534, 537, 375 S.E.2d 403, 404 (1989).

In this case, the delinquent acts committed by appellant included armed robbery in violation of Code § 18.2-58 and capital murder in violation of Code § 18.2-31(4).[6] Code § 16.1-269(A)(3)(b) specifically lists these acts as not requiring a finding of nonamenability. Thus, the trial judge did not abuse his discretion in determining nonamenability based solely on the nature of the charges.

**IV. JUROR STRIKE**

Appellant next argues that the trial court erred in refusing

---

for: (i) murder under Article 1; (ii) mob-related felony under Article 2; (iii) kidnapping or abduction under Article 3; or (iv) assault or bodily wounding under Article 4; or
2. Any unclassified felony violation of Chapter 4 (§ 18.2-30 et seq.) of Title 18.2 which carries a maximum penalty of imprisonment for life or a term of imprisonment of forty years if committed by an adult.

[6]Although not raised by appellant, we note that the use of a firearm in the commission of murder charge is encompassed within the "delinquent act" of murder as enumerated in the statute.

to strike for cause venireman Jeff Morris (Morris) because Morris was predisposed to imposing the death penalty.

During voir dire, the trial judge asked Morris: "[W]ould you be able to consider voting for a sentence less than death?" Morris answered: "I don't think so." The judge and both attorneys then questioned Morris regarding his views on the death penalty. Morris testified that: (1) he would not automatically vote for the death penalty; (2) he would follow the instructions of the court; and (3) he would vote for life imprisonment if the Commonwealth failed to prove the aggravating factors. The court found, over appellant's objection, that Morris was qualified as a juror and refused to excuse him for cause. The judge stated:

> Although there were certain things that . . . Mr. Morris, the juror, stated [that] were maybe not correct or his personal feeling, he did not hesitate when all the voir dire is considered to respond with respect to instruction of law by the Court. And I believe that based upon my view of the juror he is under all circumstances qualified to serve as a juror.

Appellant used his first peremptory strike to remove Morris from the panel.

> On appeal, this Court "must give deference to the trial court's decision whether to retain or exclude individual veniremen because the trial court 'sees and hears the juror.' For that reason, the trial court's decision in that regard will not be disturbed on appeal absent a showing of 'manifest error.'
>
> The standard to be applied by the trial court in determining whether to retain a venireman on the jury panel is whether his

19

answers during <u>voir dire</u> examination indicate to the court something that 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"

<u>Satcher v. Commonwealth</u>, 244 Va. 220, 236, 421 S.E.2d 821, 831 (1992) (citations omitted) (quoting <u>Eaton v. Commonwealth</u>, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), <u>cert. denied</u>, 502 U.S. 824 (1991)), <u>cert. denied</u>, 113 S. Ct. 1319 (1993).

In <u>Satcher</u>, the Supreme Court of Virginia upheld the trial court's refusal to strike five prospective jurors for being predisposed to the death penalty.  244 Va. at 236, 421 S.E.2d at 831.  The Court determined that, although all five veniremen indicated a favorable attitude toward the death penalty, they stated that:  (1) they could impose life imprisonment in a murder case; (2) they would consider mitigating evidence; (3) they would render an impartial verdict regardless of their views about the death penalty; and (4) they would follow the court's instructions about the Commonwealth's burden of proving aggravating factors. <u>Id.</u> at 235, 421 S.E.2d at 830-31.  "[W]ith respect to all five, the trial court expressed confidence in their ability to follow the court's instructions, to stand indifferent to the cause, and to render a fair verdict."  <u>Id.</u> at 236, 421 S.E.2d at 831.

The colloquy in the instant case is less compelling than that in <u>Satcher</u>, and the trial court did not err in refusing to strike Morris for cause.  Morris testified that:  (1) he would vote for life imprisonment if the Commonwealth failed to prove

20

the aggravating factors; (2) he would consider mitigating factors; (3) he had not formed an opinion about appellant's guilt and would have an open mind; and (4) he would follow the judge's instructions. The trial court's decision to retain Morris does not show "manifest error" but rather careful consideration by the trial judge, who was in the best position to determine Morris's qualifications.

### V. JURY VIEW

Appellant contends that the trial court erred in denying his motion for a jury view of the crime scene because some of the jurors knew more than others about the Super Fresh grocery store where the shooting occurred. In denying appellant's motion, the trial judge stated as follows:

> [W]e're not sure what things are there that were not there [eleven months ago] or pertinent parts of the store or outside of the store, whether the lighting is different, whether many things are different.
>
>     \*    \*    \*    \*    \*    \*    \*
>
> Here there are many factors that are important in determination of the case, the lighting, the time of day, how the lights were reflecting, various things. And the thing that concerns me is . . . whether . . . the jury may attempt to substitute what they see on a view for what evidence they heard
>     . . . .

Code § 19.2-264.1 allows a jury view in criminal cases "when it shall appear to the court that such view is necessary to a just decision." Granting a view is within the sound discretion of the trial court. <u>Quesinberry v. Commonwealth</u>, 241 Va. 364,

21

378, 402 S.E.2d 218, 227, <u>cert. denied</u>, 502 U.S. 834 (1991).

We find no abuse of discretion by the trial court. Photographs, diagrams, and other evidence established the layout of the store, and the view was not "necessary to a just decision."

## VI.  SUFFICIENCY OF THE EVIDENCE

### (A) Robbery

Lastly, appellant argues that the trial court erred in finding the evidence sufficient to support both his robbery and murder convictions.  He contends initially that the evidence failed to establish that he took beer from the store.  At trial, the evidence was disputed as to whether appellant took beer from the Super Fresh store.

"Determining the credibility of witnesses who give conflicting accounts is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify."  <u>Lea v. Commonwealth</u>, 16 Va. App. 300, 304, 429 S.E.2d 477, 479 (1993).  "The jury's finding that a particular witness was credible will not be reversed on appeal unless plainly wrong or without evidence to support it."  <u>Id.</u>

In this case, the evidence established that appellant had beer in his possession when he entered the car following the shooting.  Appellant's testimony that he handed beer to Silver while inside the store was contradicted by Wood, one of appellant's companions.  Wood testified that appellant had beer

22

when he "got into the car." (Emphasis added). The jury was entitled to believe Wood over appellant.

Robbery is defined as "'the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation.'" Beard v. Commonwealth, 19 Va. App. 359, 361-62, 451 S.E.2d 698, 699-700 (1994) (quoting Johnson v. Commonwealth, 209 Va. 291, 293, 163 S.E.2d 570, 572-73 (1968)).

> The distinctive elements of robbery are (1) the use of violence, or the threat thereof, against the victim, and (2) the theft of property from his person or in his presence. Theft of property is a trespass upon the rights of the owner therein for as long as he is deprived of the use thereof; he retains legal possession of the goods stolen even when they are in the actual possession of the thief. In a robbery prosecution, where the violence against the victim and the trespass to his property combine in a continuing, unbroken sequence of events, the robbery itself continues as well for the same period of time.

Briley v. Commonwealth, 221 Va. 532, 543, 273 S.E.2d 48, 55 (1980) (citation omitted), cert. denied, 451 U.S. 1031 (1981). The Supreme Court of Virginia has "affirmed convictions for capital murder during the commission of a robbery when the evidence was sufficient to support a conclusion that the killing and theft were interdependent objects of a common criminal design." Quesinberry, 241 Va. at 374, 402 S.E.2d at 224. "[W]here a killing and a taking of property are so closely related in time, place, and causal connection as to make them

parts of the same criminal enterprise, the predicates for capital murder . . . are established."  Pope v. Commonwealth, 234 Va. 114, 125, 360 S.E.2d 352, 359 (1987), cert. denied, 485 U.S. 1015 (1988).

In Quesinberry, the defendant and an accomplice planned to break into a warehouse.  Before going to the warehouse, the defendant stopped to get his gun for "security."  While the defendant and his accomplice were stealing money from an office in the warehouse, the warehouse owner interrupted them.  The owner ran, and the defendant chased and shot him.  The defendant and his accomplice then took the money and left the warehouse. Quesinberry, 241 Va. at 368-69, 402 S.E.2d at 221.

"When considering the sufficiency of the evidence on appeal of a criminal conviction, we must view all the evidence in the light most favorable to the Commonwealth . . . ."  Traverso v. Commonwealth, 6 Va. App. 172, 176, 366 S.E.2d 719, 721 (1988). In this case, the evidence established that appellant and his companions planned a trip to the store to steal beer.  Before appellant went inside the store, he put the gun in his jacket pocket, "just in case," intending to use the gun if anyone tried to stop them.  Appellant hid a bottle of beer in his pocket.  As he was leaving, the manager stopped him, and appellant shot the manager in the face.  Under these circumstances, as in Quesinberry, the evidence was sufficient to show that the taking of the beer and the killing of Daniel were part of the "same

24

criminal enterprise" and intimately connected.

Appellant contends that, even if he took the beer, it was a completed act before he encountered the manager and thus no robbery occurred. However, this Court has endorsed the concept of continuing asportation. Beard, 19 Va. App. at 363, 451 S.E.2d at 700. In Beard, we held that "asportation of stolen property continues and is not complete until the taker severs the property from the absolute control and possession of the victim." Id. In this case, appellant's asportation of the beer continued until he shot the store manager in the face and took beer from the manager's dominion and control.

## (B)  Murder

Appellant also asserts that the evidence is insufficient to support his conviction for murder because he testified that the gun discharged accidentally.  Again, appellant's version of events was disputed by Agent Decker, who testified that he saw appellant shoot the manager in the face and that the manager did not cause the gun to discharge accidentally.  Specifically, Agent Decker stated as he demonstrated for the jury:

> They were approximately this far apart and their shoulders I remember were square.  The defendant turned to his right and smiled, a few seconds later similar to this, that quick, [his] right arm goes up . . . to Steve Daniel's face.  I heard a popping sound. Daniel immediately collapsed to the floor.

> *     *     *     *     *     *     *

> I did not see any contact [between Mr. Daniel and the defendant].

The jury, as fact finder, was entitled to believe Agent Decker over appellant.  The evidence was sufficient to convict appellant of murder, and, accordingly, the decision of the trial court is affirmed.

<u>Affirmed</u>.