Present: Carrico, C.J., Compton, Lacy, Hassell, Keenan, and
Kinser, JJ., and Whiting, Senior Justice

CHAUNCEY JACOB JACKSON

                                            OPINION BY
v. Record Nos. 971720 & 971721   SENIOR JUSTICE HENRY H. WHITING
                                            April 17, 1998
COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                       Lydia Calvert Taylor, Judge

     In these appeals, we review a capital murder conviction, a

sentence of death (Record No. 971720), and five other related

felony convictions (Record No. 971721).

                            I. PROCEEDINGS

     On September 1, 1994, 16-year-old Chauncey Jacob Jackson

was arrested and incarcerated on charges of capital murder and

five other felonies.[1]  The alleged crimes had all occurred the

day before.  On September 21, 1994, the Norfolk Juvenile and

Domestic Relations District Court issued transfer orders

pursuant to Code § 16.1-269.1, certifying Jackson to the circuit

court for criminal proceedings as an adult on those charges.

     On October 5, 1994, indictments were issued in the circuit

court charging Jackson with the following six felonies: (1) the

capital murder of Ronald Gene Bonney, Jr., while attempting to

rob him (Code §§ 18.2-31(4), 18.2-10), (2) attempted robbery

_____

[1] Although Jackson's middle name is shown as "Jacob" in the
pleadings and in many of the documents in the file, he described
and spelled it as "Jabob" in his statements to the police.

(Code §§ 18.2-58, 18.2-26), (3) and (4) two charges of the use of a firearm while committing the above-mentioned offenses (Code §§ 18.2-53.1, 18.2-10), (5) the conspiracy to commit a robbery (Code §§ 18.2-22, 18.2-58, 18.2-10), and (6) the receipt of stolen property (§§ 18.2-108, 18.2-95). The trial date was fixed and continued eight times, six times on Jackson's motion and two times on joint motion of Jackson and the Commonwealth.

During the 23-month interval between the date of the transfer order and August 21, 1996, when Jackson's trial began, it was discovered that indictments had been issued before the circuit court conducted the review of Jackson's transfer required by Code § 16.1-269.6. On June 23, 1995, after conducting the required review, a circuit judge other than the trial judge concluded that the applicable statutes had been complied with and authorized the Commonwealth to proceed against Jackson by indictment. However, Jackson was not indicted on these charges for the second time until December 6, 1995.

At the beginning of a bifurcated jury trial on August 21, 1996, Jackson was arraigned on the December 1995 indictments. The trial was conducted pursuant to the provisions of Code §§ 19.2-264.3, -264.4, and -295.1, and Jackson was found guilty of all six charges. After hearing additional evidence, the jury fixed Jackson's punishment for the capital murder conviction at death, based on the "future dangerousness" predicate. Code

2

§ 19.2-264.2. After considering a report prepared by a probation officer pursuant to Code § 19.2-264.5, the court sentenced Jackson in accordance with the jury verdict in the capital murder case. Since he was a juvenile when the offenses were committed, the court sentenced Jackson on the remaining offenses in conformity with Code §§ 16.1-269.1 and -272 to terms of imprisonment aggregating 48 years. The court suspended eighteen years of the sentence for the conviction of receiving stolen goods, subject to 20 years' probation.

Pursuant to Code § 17-110.1(F), we have consolidated the automatic review of Jackson's death sentence with the appeal of right of his capital murder conviction. By order entered August 14, 1997, Jackson's appeal of his other convictions was certified from the Court of Appeals, Code § 17-116.06, and we have consolidated that appeal with the capital murder appeal and given them priority on our docket. Code § 17-110.2.

## II. THE EVIDENCE

We review the evidence in the light most favorable to the Commonwealth, the prevailing party in the circuit court. Roach v. Commonwealth, 251 Va. 324, 329, 468 S.E.2d 98, 101, cert. denied, 519 U.S. ___, 117 S.Ct. 365 (1996).

## A. Guilt Phase

The day after Bonney's murder, Jackson made a series of four oral statements to police investigators. The first

3

statement was not recorded, but the remaining three statements were recorded and transcribed.  The following facts appear in one or more of those statements.

On the evening of August 31, 1994, Jackson was riding in a Jeep Cherokee driven by his friend, Rashad Vick.  Vick stopped the vehicle when three other friends, standing near a so-called "dope house" on Vine Street, waved at them.  One of the three friends suggested robbing a man, later identified as Ronald Gene Bonney, Jr., who was within sight, seated in the driver's seat of a Chevrolet Blazer parked nearby.  Jackson and Vick agreed.

Accordingly, two of the group acted as "lookouts."  Jackson procured a .25 caliber Beretta handgun from the Jeep. Accompanied by Calvin Outlaw and Angelo Artis, the other two members of the group, Jackson approached the parked vehicle. Outlaw placed his leg against the driver's door, next to Bonney, and later took the keys from the ignition switch when Bonney tried to drive away.  Jackson, armed with the handgun, entered the front seat of the vehicle from the passenger's side, and, according to his last statement, Jackson told Bonney to "[g]ive it up."  Bonney then "started patting his pockets and said, 'Give what up?' . . . .  And then [Bonney] said, 'Shoot me, you little f--ker.'  And then I cocked the gun, and then Angelo stepped up, and the gun jammed, and I tried to unjam it, and it shot."  The gun fired three bullets which hit Bonney in the

4

chest and arm and caused his death.

Jackson fled in the Jeep. He was arrested late that night and brought to police investigators for an interview at 7:20 a.m.

### B. Penalty Phase

The Commonwealth introduced evidence of Jackson's criminal record. It began with a finding that he was not innocent of the theft of a car when he was 13 years old and included, a few months later, a finding that he was not innocent of receiving stolen property. When Jackson was 14 years old, he was also found not innocent of possession of cocaine. Additionally, Jackson was found not innocent of a number of offenses dealing with motor vehicles, such as unauthorized use of an inspection sticker, driving without a license, altered license plates, and speeding. Many of the offenses were committed while Jackson was on probation for earlier offenses.

Jackson had been incarcerated for more than 13 months on the present charges when he was released on bond on October 24, 1995. In December 1995, while free on bond awaiting trial for the subject offenses, Jackson was involved with several other persons in the unlawful entry of a house in Jackson's neighborhood, and later convicted of the following 14 felony charges arising therefrom: statutory burglary, four abductions,

robbery, attempted robbery, and seven charges of use of a firearm during the commission of those crimes.

Additionally, an inmate testified that Jackson, again incarcerated after the December 1995 incidents, assaulted him in jail on February 9, 1996. This assault occurred less than two months after Jackson had committed the December 1995 crimes and before his capital murder trial in August and September 1996.

Jackson called as witnesses Dr. Evan S. Nelson and Dr. Thomas Pasquale, both forensic psychologists, who had examined and evaluated him. Both testified that Jackson had an antisocial personality disorder, basing their diagnosis in part on Jackson's history of aggressive acts. Dr. Nelson assessed Jackson as having a high number of "risk factors" for violent conduct and Dr. Pasquale at one time had evaluated Jackson as being a "moderate to severe [assault] risk." However, both psychologists declined to say that Jackson would be a future danger to society. Dr. Nelson felt that an affirmative answer to the question required a psychologist to "predict with certainty that someone will commit an offense of violence in the future." Dr. Pasquale "follow[ed] the guidelines of the American Psychological Association" which state that "psychologists are best not to make such predictions due to the fact that we have not developed the circumstances sufficiently to be able to do so."

6

Although both psychologists testified that an antisocial personality disorder cannot be cured, Dr. Pasquale opined that a person with such a disorder could be "amenable to management." On the other hand, Dr. Nelson thought that Jackson's history of continued violent acts, especially when under the constraints of probation, bond, and incarceration awaiting trial on these charges, was a "very negative indicator for how much change [from his violent acts against Bonney] we can expect from him over the years."

Jackson's mother and grandmother, with whom Jackson lived, testified that Jackson had been a normal child, and that they had a good relationship with him. The grandmother said that Jackson had been a good boy "until, you know, he got with the wrong bunch of kids." And the mother testified that Jackson received a "long-term" suspension from school because, while waiting in the school office for some sort of a disciplinary interview, Jackson had told another student that he would kill "somebody" if he were suspended from school.

Neighbors and persons who had contact with Jackson when he was living at home described him as "respectful," "polite," and "courteous." A member of Jackson's community also testified that Jackson called her to ask "how [she] was doing" after an operation.

One of the members of the family that was burglarized and robbed by Jackson and other intruders in December 1995 testified that she knew Jackson and that he "just stood there" and "had some tears in his eyes" during the robbery. However, she also testified that Jackson had a gun and, like the other intruders, was wearing a hood that partially masked his face.

### III. WAIVER OF CERTAIN ASSIGNMENTS OF ERROR

Jackson did not brief, and has therefore waived, assignments of error 6, 9, 12, 21, 29, and 32. Rule 5:27; Rule 5:17(c)(4); Williams v. Commonwealth, 248 Va. 528, 537, 450 S.E.2d 365, 372 (1994), cert. denied, 515 U.S. 1161 (1995).[2]

### IV. ISSUES PREVIOUSLY DECIDED

In the remaining assignments of error, Jackson raises a number of issues which we have previously decided adversely to his contentions. Because he offers no persuasive reasons to modify our previous conclusions, and we perceive none, we will adhere to our previous rejections of those contentions. Hence, we will not discuss these contentions beyond identifying the assignments of error to which we believe each contention relates and citing representative cases in which those arguments were

---

[2] It has been difficult to ascertain which assignments of error have been briefed or which of the 37 assignments of error relate to the 29 questions presented by Jackson. Jackson has not given "a clear and exact reference to the particular assignment of error to which each question relates" as required by Rule 5:27

expressly rejected.

The death penalty constitutes cruel and unusual punishment. Rejected in Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122, cert. denied, 519 U.S. ___, 117 S.Ct. 222 (1996); Joseph v. Commonwealth, 249 Va. 78, 82, 452 S.E.2d 862, 865, cert. denied, 516 U.S. 876 (1995).

"[I]mposition of the death penalty based on 'future dangerousness' is unconstitutional because the use of [a] prior unadjudicated factor is permitted without any requirement that the conduct be established by any standard of proof."  Rejected in Breard v. Commonwealth, 248 Va. 68, 74-75, 445 S.E.2d 670, 675, cert. denied, 513 U.S. 97l (1994); Satcher v. Commonwealth, 244 Va. 220, 228, 421 S.E.2d 821, 826 (1992), cert. denied, 507 U.S. 933 (1993); Stockton v. Commonwealth, 241 Va. 192, 210, 402 S.E.2d 196, 206, cert. denied, 502 U.S. 902 (1991).

The statute and the court's instructions in conformity thereto which permit imposition of the death penalty based on "future dangerousness" are unconstitutional because they are "incomplete and vague" and do not provide "meaning and guidance."  Rejected in Williams v. Commonwealth, 248 Va. at 535, 450 S.E.2d at 371.

Allowing the introduction of evidence of Jackson's

---

and 5:17(c)(4).  Indeed, he rarely refers to the assignments of error by number in the arguments in his brief.

9

convictions for other crimes in the sentencing phase to establish future dangerousness violates the double jeopardy clause of the Fifth Amendment of the United States Constitution. Rejected in Mickens v. Commonwealth, 247 Va. 395, 404, 442 S.E.2d 678, 684-85, vacated on other grounds, 513 U.S. 922 (1994); Stewart v. Commonwealth, 245 Va. 222, 229, 427 S.E.2d 394, 400, cert. denied, 510 U.S. 848 (1993); Yeatts v. Commonwealth, 242 Va. 121, 126, 410 S.E.2d 254, 258 (1991), cert. denied, 503 U.S. 946 (1992).

This Court's method of reviewing the proportionality of the sentence by considering the records only of those murder cases in which sentences of death were imposed and not of those murder cases in which lesser sentences were imposed is invalid. Rejected in Stamper v. Commonwealth, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980) ("test is not whether a jury may have declined to recommend the death penalty in a particular case but whether generally juries in this jurisdiction impose the death sentence for conduct similar to that of the defendant").

## V. PRETRIAL MATTERS

### A. Discovery of Exculpatory Evidence

Jackson complains that the trial court did not "order appropriate relief" when it failed to require the Commonwealth to produce "exculpatory statements, evidence or admissions," and

10

to "ensure that no such evidence existed; or, in the event that it did exist, that it be provided for counsel for the defendant."  However, he does not state in what respects the court failed to provide such relief or how Jackson was prejudiced thereby.

As the Commonwealth observes on brief, the record indicates that Jackson was supplied with all exculpatory evidence within the Commonwealth's knowledge, which he used at trial. Accordingly, we find no merit in this contention.

### B. Suppression of Jackson's Statements to Police

Jackson does not dispute the sufficiency of the Commonwealth's evidence indicating that before his in-custody interrogation by the police, he was fully advised of his Fifth Amendment rights as required by Miranda v. Arizona, 384 U.S. 436, 467-73, 479 (1966).  Although a juvenile, Jackson was not unfamiliar with these rights as evidenced by his statement to Investigator John R. Malbon that he had previously been arrested and informed of his legal rights "about three times."  Malbon testified that while being advised of his rights, Jackson appeared "calm" and "alert."  In any case, Jackson does not contend that he failed to understand either his rights or the effect of a waiver but rather that the police engaged in a strategy designed to capitalize on Jackson's youth and isolation.  His claim is that the police interrogated him for

"approximately 25 to 28 hours" and placed him "in a situation where he was deprived of sleep, deprived of the advice and counsel of his mother, [and he] was placed in a small windowless interrogation room for hours on end, and denied repeated access by his parent to him despite her best efforts."

We find no support in the record for Jackson's statement that he was deprived of sleep and interrogated for 25 to 28 hours. Jackson was brought to the Norfolk Police Department on the night of Bonney's murder and put in a temporary holding cell. Although he was awakened several times during the night and offered food, water, and use of the bathroom, Jackson was permitted to sleep until 7:05 the following morning.

The investigators interrogated Jackson four separate times between 7:20 a.m. and 1:59 the next morning. These sessions, together with related contacts setting up the interviews and permitting Jackson to review the written transcripts of the preceding two interrogations, totaled four hours and thirty-eight minutes. The longest uninterrupted period of contact with Jackson was one hour and twenty minutes. After each contact, Jackson was left alone either in a locked cell or a locked interview room while police investigated the accuracy of his statements.

Jackson decided not to testify at the pretrial hearing on the admissibility of his confession and called his mother, Carol

12

Lee Jackson, as his only witness on this subject.  Her testimony focused primarily on the alleged delay by the police in permitting her to see her son.

Jackson does not claim that he asked for the presence of his mother,[3] but suggests that police interrogation of a 16-year-old juvenile without the presence of one of his parents is a violation of his constitutional rights.  In Wright v. Commonwealth, 245 Va. 177, 185-86, 427 S.E.2d 379, 385-86 (1993), vacated on other grounds, 512 U.S. 1217 (1994), we rejected the contention of a juvenile capital murder defendant that his confession was involuntary in part because his mother was not present at the interrogation.  Like Jackson, Wright had been advised of his rights when arrested on prior occasions and had knowingly waived those rights before making the statement at issue.  Perceiving no significant difference between the situation in Wright and the situation in this case, we reject Jackson's suggestion.

The alleged police delay in honoring Ms. Jackson's request to see her son is irrelevant to the issue of the voluntariness of his statements.  As the United States Supreme Court observed in Moran v. Burbine, 475 U.S. 412, 422 (1986), "[e]vents

_____

[3] Jackson did ask whether his mother was in the building during his interrogation and was told that she was not.  Therefore, we do not consider the effect, if any, of a police officer's

13

occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right."  In Moran, the police failed to tell a suspect in custody that his attorney was trying to reach him.  Id. at 433.  Under these circumstances, the Constitution of Virginia provides no greater protection than the Fifth Amendment of the United States Constitution.  See Walton v. City of Roanoke, 204 Va. 678, 682, 133 S.E.2d 315, 318 (1963).  Hence, we find no violation of Jackson's rights under either constitution because of the failure of the police to permit Ms. Jackson immediate access to her son.  For these reasons, we conclude that Jackson's statements were the product of his free will, made after a knowing, voluntary, and intelligent waiver of his Miranda rights.  See Wright, 245 Va. at 185-86, 427 S.E.2d at 385-86.

## C. Change of Venue

Jackson complains that the trial court denied him the opportunity to present evidence of pre-trial publicity. Jackson further alleges that the trial court had "clearly made up her mind on the issue of pre-trial publicity, and ultimately on the motion for change of venue."

Contrary to these claims, the record shows that the trial

---

failure to honor a request by a juvenile for the presence of a parent or guardian during an in-custody interrogation.

14

court merely told Jackson's counsel that his oral proffer was insufficient to schedule a hearing on this issue at that time. However, the court permitted counsel a period of more than three weeks in which to produce affidavits indicating that an impartial jury could not be selected in Norfolk, after which the court would consider fixing a date to hear evidence from both sides on that issue. No affidavits were produced and, in fact, Jackson filed no newspaper articles or other information with the court.

Thus, the court was not presented with evidence sufficient to overcome the "presumption that a defendant can receive a fair trial from the citizens of the county or city in which the offense occurred." Stockton v. Commonwealth, 227 Va. 124, 137, 314 S.E.2d 371, 379, cert. denied, 469 U.S. 873 (1984). Hence, we reject this contention.

### D. Jury Matters

1. Refusal to strike entire venire

As prospective members of the jury sat in the courtroom completing jury questionnaires, the court conducted sentencing proceedings in an unrelated matter and explained to those parties that, although a defendant in a pre-1995 case may be eligible for parole, an exact calculation of how much time he would serve was impossible. Jackson asked the court to strike

the panel because this explanation was made within the hearing of his venire.

As soon as Jackson raised the issue, the court asked the entire venire who among them had heard its discussion. Although 20 panel members indicated that they had heard parts of the court's explanations, none of them was among the venire comprising panel members from whom the jury was actually selected. Under these circumstances, we find no error in the trial court's refusal to strike the entire venire.

2. Peremptory strikes by the Commonwealth

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the United States Supreme Court held that purposeful discrimination based on race in selecting jurors violates the Equal Protection Clause. If an accused makes a prima facie showing of the prosecution's use of peremptory strikes on the basis of race, the burden shifts to the prosecution to articulate race-neutral reasons for such strikes. Chichester v. Commonwealth, 248 Va. 311, 323, 448 S.E.2d 638, 646 (1994), cert. denied, 513 U.S. 1166 (1995).

In exercising its peremptory strikes, the Commonwealth removed four black members of the venire. When challenged as to the reasons for three of the four strikes, the Commonwealth gave the following explanations: one prospective juror had "fairly recent DUI and CCW convictions," another's son had been

convicted of firearm possession and for selling drugs, and the third was a social services employee.  One of the prosecutors with experience with social services employees found them to be "fairly liberal" and without exception possessed of a belief that treatment rather than punishment was a more appropriate way of dealing with juvenile offenders.

Jackson, who is black, does not attack the racial neutrality of these statements; instead he claims that they were pretextual explanations designed to mask racially discriminatory reasons for the peremptory strikes.  Concluding that Jackson has failed to carry his burden of showing that the court abused its discretion in accepting those explanations, we find no merit in this contention.  See James v. Commonwealth, 247 Va. 459, 461-62, 442 S.E.2d 396, 398 (1994).

3.  Refusal to grant Jackson's strikes for cause

In reviewing a trial court's action in denying a motion to strike prospective jurors for cause, absent manifest error, we defer to the trial court's exercise of discretion.  Roach, 251 Va. at 343, 468 S.E.2d at 109; Yeatts v. Commonwealth, 242 Va. at 134, 410 S.E.2d at 262.  Applying this standard, we find no error in the trial court's refusal to sustain Jackson's motions to strike the following three prospective jurors for cause.

Robert Lee was one of a group of five prospective jurors present when another member of the group asked whether the jury

17

would be able to "say no to the death penalty and yes to life but life without parole?"  The court responded:

> No.  The jury has very limited things they're told to do.  They can only do what they're told to do.  They can say life or they can say death.  That's all they're allowed to do.

The court offered to discuss the matter further with the five members of the venire and to ask them whether her explanation had affected the venire members in any way prejudicial to Jackson.  Jackson declined both offers.  Hence, he waived any objection he may have had to the court's response.

Prospective juror Elizabeth Huffman's first cousin was the wife of the Commonwealth's attorney for the City of Norfolk.  The Commonwealth was represented throughout the trial by two assistant Commonwealth's attorneys; the Commonwealth's attorney signed none of the pleadings and did not appear at trial.

Ms. Huffman testified that she generally saw her cousin's husband only twice a year at family gatherings and that her limited association with him would not affect her ability to give Jackson a fair trial.  However, Jackson claims that, because she indicated that these family gatherings were at Christmas and other important holidays, she "gave the insurmountable appearance of bias for a juror in a capital murder case."  We do not agree.

18

The relationship Ms. Huffman had with the Commonwealth's attorney does not disqualify her from sitting on this jury. See Roach, 251 Va. at 343, 468 S.E.2d at 109 (Commonwealth's attorney in capital murder case formerly represented prospective juror in matter and prospective juror still regarded him as his "personal attorney"); Wise v. Commonwealth, 230 Va. 322, 325, 337 S.E.2d 715, 717 (1985), cert. denied, 475 U.S. 1112 (1986) (Commonwealth's attorney "golfing buddy" and "long standing" friend of prospective juror).

An illiterate juror was seated over Jackson's objection. Recognizing that illiteracy does not disqualify a juror under any statute in Virginia, Jackson contends that seating such a person as a juror violates "his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution" and the "strong public policy against seating illiterate jurors." Jackson claims that such a policy is reflected in 28 U.S.C. § 1865, which requires a juror in the federal courts to be able to read, write, and understand the English language. Jackson argues that "he had the benefit of at most, eleven jurors [and] [i]t is unknown what one juror or more, may have said to [the illiterate juror] or whether they made any mistakes, intentional or unintentional, in reading the written materials."

We do not agree with Jackson. In Virginia, illiteracy does not automatically disqualify a person from serving as a juror if

19

the trial court takes steps to assure that the illiterate juror

has essentially the same opportunity to review the written

material in the case as the other jurors.  Here, the record

indicates that virtually all the documentary evidence, the

court's instructions to the jury, and the verdict forms were

read to the jury, and that the illiterate juror was able to have

any documents read to her by the other jurors.  And we assume

that the other jurors accurately read the documents to the

illiterate juror.

**E. Circuit Court Review of Juvenile Court
Transfer Proceedings**

Jackson raises a number of issues stemming from the nine-

month period before the circuit court reviewed the juvenile

court's transfer order.

As relevant, Code § 16.1-269.6(B) in effect in September

1994 provided that:

> The circuit court shall, within a reasonable time
> after receipt of the case from the juvenile court (i)
> examine all such papers, reports and orders; (ii) if
> either the juvenile or the attorney for the
> Commonwealth has appealed the transfer decision,
> conduct a hearing to take further evidence on the
> issue of transfer, to determine if there has been
> substantial compliance with § 16.1-269.1, . . . and
> (iii) enter an order either remanding the case to the
> juvenile court or advising the attorney for the
> Commonwealth that he may seek an indictment.

As we have noted earlier, there was no such review before the

October 1994 indictments were returned.  The review occurred on

July 23, 1995.

Jackson maintains that the court should have sustained his motion to quash the October 1994 indictments on the ground that they were issued before the circuit court had entered its July 1995 order authorizing the Commonwealth to proceed by indictment against him. The Commonwealth responds that no such review was required in this case because neither party appealed the transfer order.

We do not agree with the Commonwealth. The statute clearly required this review, even if neither party filed an appeal to the juvenile court's transfer order. If such an appeal is filed, the statute required the circuit court to schedule a hearing in addition to its review.[4]

Accordingly, we conclude that the circuit court had no jurisdiction to try Jackson on the October 1994 indictments. Even so, the court had jurisdiction over Jackson following the required circuit court review of the transfer order and it could and did try him on the indictments issued thereafter.

This brings us to Jackson's contentions that the court should have sustained his motion to dismiss the December 1995 indictments. The Commonwealth's attorney sought and obtained

---

[4] The statute presently in effect does not require the review if the transfer decision is not appealed. Code § 16.1-269.6(B); II Acts of Assembly 1996, c. 755, p. 1338.

21

those indictments in accordance with the circuit court's authorization order entered after its transfer review in June 1995. Jackson reasons that the circuit court never acquired jurisdiction over him because it failed to act upon the juvenile court's transfer order within a reasonable time, as required by Code § 16.1-269.6(B), and he never had the benefit of a subsequent and more current juvenile court transfer review prior to his December 1995 indictments. We find no merit in either contention.

Although the requirement of a transfer review is jurisdictional, the time within which that review must be made is procedural. Jamborsky v. Baskins, 247 Va. 506, 511, 442 S.E.2d 636, 638-39 (1994). In Jamborsky, we concluded that, absent a showing of prejudice to the juvenile's due process rights, a procedural error in conducting the review three days after the then statutorily specified 21-day period for review, did not invalidate the review. Id., 442 S.E.2d at 638.

Here, the nine-month period before conducting the review was unreasonable and constituted a procedural error in failing to comply with the statute in effect at that time. However, Jackson does not claim that he was prejudiced by the delay in conducting the review. Indeed, the record indicates that Jackson treated the case as properly before the circuit court and continued his preparation in the same manner before and

22

after he was told on October 24, 1995, of the circuit court's failure to conduct the review of his transfer order within a reasonable time. The record fails to disclose that the procedural error prejudiced Jackson in such a manner as to constitute a denial of due process. See id. Accordingly, we find no merit in this contention.

### F. Violation of Rights to a Speedy Trial

This brings us to Jackson's contention that his constitutional and statutory rights to a speedy trial have been violated. Jackson's trial did not begin within the periods fixed for a speedy trial by Code § 19.2-243 and it may not have begun within a period considered as constitutionally permissible under normal circumstances.

However, we find no violation of those rights in these cases. As we have noted, every continuance was either on Jackson's motion alone or a motion he made jointly with the Commonwealth. Under these circumstances, we conclude that Jackson has waived his statutory and constitutional rights to a speedy trial. O'Dell v. Commonwealth, 234 Va. 672, 681, 364 S.E.2d 491, 496, cert. denied, 488 U.S. 871 (1988); see also Barker v. Wingo, 407 U.S. 514, 534 (1972).

Nevertheless, since the circuit court had no jurisdiction to try him on the October 1994 indictments, Jackson contends that the waivers of his speedy trial rights before his release

23

on bond in October of 1995 were as void as those indictments. In deciding whether to transfer Jackson for proper criminal proceedings, Code § 16.1-269.1(2) requires the juvenile court to find "that probable cause exists to believe that the juvenile committed the delinquent act as alleged."  The delinquent acts alleged were the commissions of six felonies referred to earlier.  Accordingly, Jackson's speedy trial rights attached upon that determination of probable cause.  Compare Code § 16.1-269.1(2) with Code § 19.2-243 (speedy trial rights of an accused attach upon general district court's finding of probable cause "to believe that the accused has committed a felony").

It was those rights that Jackson waived in his motions for a continuance of the trial, not any right having to do with the validity of the indictments returned against him in the circuit court.  For these reasons, we reject this contention.

VI. THE TRIAL

A. Guilt Phase Issues

1.  Testimony of Lakisha Spruill

Shortly before the expected close of the Commonwealth's case in chief, it appeared that a recess until the next day would be required to obtain the presence of a witness for Jackson.  To conserve trial time, the court suggested that the Commonwealth rest its case except for some evidence relating to Jackson's failure to conform to court orders to appear in

24

criminal matters and his flight to avoid arrest on an unrelated motor vehicle charge. Defense counsel responded that "I think procedurally we cannot do that." When the court responded that it was "a perfectly acceptable procedure," defense counsel made and argued the motion to strike, which the court considered and denied.

The next day, the Commonwealth called Lakisha Spruill, an eyewitness to Jackson's encounter with Bonney. Jackson objected to this action on the ground that the Commonwealth had rested its case. Jackson did not claim that he would be surprised by Spruill's testimony or that he had not talked to her about her testimony. In fact, he had summoned her as a witness. The court overruled the objection, assigning a number of reasons for its action, one of which was that it had the discretion to vary the order of trial.

Jackson argues that he was prejudiced by the court's action (1) in requiring him to argue the motion to strike in which he pointed out the lack of corroboration of Jackson's attempted robbery of Bonney before the Commonwealth had actually rested its case, and (2) in permitting Spruill to testify after Jackson had made his motion to strike.

In the absence of a showing of prejudice, a trial court may, in the exercise of its discretion, permit the Commonwealth to reopen its case after it has rested and the defendant has

25

moved to strike the evidence.  Hargraves v. Commonwealth, 219 Va. 604, 608, 248 S.E.2d 814, 816-17 (1978).  We will not reverse such a ruling, absent an abuse of discretion.  Id. Under the circumstances of this case, and without necessarily approving the procedure followed, we are unable to say that the court abused its discretion in permitting the Commonwealth to call Spruill as a witness after it had rested its case.  Nor can we say that the trial court erred in holding that Jackson was not prejudiced by its action.

2.   Rulings on sufficiency of evidence

Jackson contends that the court erred in overruling his motions to strike made at the conclusion of the Commonwealth's case and after both parties had rested their case in the guilt phase because the Commonwealth's evidence was insufficient to convict him of the crime of attempted robbery.  He bases his claim upon the Commonwealth's alleged failure to sustain its burden of proving that this crime has been committed (the corpus delicti).  Maughs v. City of Charlottesville, 181 Va. 117, 120, 23 S.E.2d 784, 786 (1943) (Commonwealth must prove corpus delicti in every criminal prosecution); Nicholas v. Commonwealth, 91 Va. 741, 750, 21 S.E. 364, 366-67 (1895). (Commonwealth's burden to establish corpus delicti); see also Epperly v. Commonwealth, 224 Va. 214, 228-29, 294 S.E.2d 882, 890-91 (1982).

Jackson's statements, as successively amended, show clearly that, pursuant to the agreement with his friends, Jackson retrieved the .25 caliber handgun from the Jeep for the purpose of robbing Bonney, and that, during the robbery attempt, when Bonney refused to give him his money, Jackson stepped out of the vehicle and fired the gun three times, killing Bonney.[5]

While Jackson recognizes that his statements tend to show the corpus delicti of attempted robbery, he argues correctly that the corpus delicti cannot be established solely by his uncorroborated statements. Wheeler v. Commonwealth, 192 Va. 665, 669, 66 S.E.2d 605, 607 (1951). However, only slight corroboration of an accused's statements is required to establish the corpus delicti when the accused fully confesses that he committed the crime. Clozza v. Commonwealth, 228 Va. 124, 133, 321 S.E.2d 273, 279 (1984), cert. denied, 469 U.S. 1230 (1985); Lucas v. Commonwealth, 201 Va. 599, 603, 112 S.E.2d 915, 918 (1960).

Jackson's confession of the attempted robbery and murder of Bonney was corroborated in many respects. The passenger who came to the scene in Bonney's Blazer testified that, after

---

[5] The jury was not required to accept Jackson's statement that the gun fired accidentally while he was attempting to clear a jam. In fact, the pistol was fired three times at some distance from Bonney and a firearms expert testified not only that the gun would not fire when jammed but also that the trigger had to be pulled each time before the gun would fire a single bullet.

discussing where to buy crack cocaine, Bonney and the passenger went to a house in Norfolk where the passenger knew he could buy drugs. When they arrived, the passenger directed Bonney to wait in the Blazer while he went into the house to make the purchase. Lakisha Spruill, an eyewitness who was seated on the porch of a house next door, saw the passenger leave the Blazer and enter the house while the driver remained in the Blazer. Spruill, who had known Jackson for some time, saw him get into the passenger's side of the Blazer, talk to the driver, and the "[n]ext thing I heard was gunshots."

The circumstantial evidence at the scene of the murder also corroborated Jackson's statements. A police investigator identified Outlaw's palm print on the driver's door of Bonney's vehicle and also testified that the keys to Bonney's vehicle were not found in the Blazer, supporting Jackson's statement that Outlaw had reached into the car and removed the keys to prevent Bonney from driving away.

In our opinion, these circumstances corroborate Jackson's confession that he had killed Bonney during an attempted robbery. The evidence demonstrates that the defendant and a confederate converged upon a stranger and engaged in conduct designed to prevent the stranger from fleeing while the defendant spoke to him and carried a loaded pistol. This corroborating evidence is consistent with a reasonable inference

28

that Jackson was attempting to rob Bonney when he shot him. Indeed, this corroborating evidence is more consistent with the commission of the offense than it is with its non-commission. See Wright v. Commonwealth, 245 Va. at 194, 427 S.E.2d at 390 (confession to attempted rape corroborated by discovery of victim's underpants which had been removed and were found at crime scene); cf. Phillips v. Commonwealth, 202 Va. 207, 212, 116 S.E.2d 282, 285 (1960) (corroborating evidence "just as consistent with non-commission of the offense as it is with its commission").

## B. Penalty Phase Issues

1. Subjecting 16-year-old defendants to death penalty

Jackson, who had attained his 16th birthday only six weeks before the offenses occurred, contends that execution of 16-year-old defendants is not authorized by statute in Virginia. According to him, in Stanford v. Kentucky, 492 U.S. 361 (1989), the United States Supreme Court made it "very clear that it is up to each state to decide the minimum age for execution" and "provide[d] that each state must enact [death penalty statutes] with great specificity, especially dealing with juveniles, in order to allow for constitutionally sound punishments."  Since Code §§ 18.2-31, 19.2-264.2 and -264.5 do not specifically provide for the imposition of the death penalty on juveniles convicted of capital murder, Jackson concludes that the death

penalty cannot be imposed upon him.  We do not agree.

Under the provisions of Code §§ 16.1-269.1 and –272, juveniles over the age of 14 years are, after proper proceedings in juvenile court and circuit court, subject to trial and possible punishment as an adult.  Indeed, in the statute in effect at the time of the crime, the legislature provided for transfer hearings in the juvenile court when such a juvenile is charged with capital murder.  Code § 16.1-269.1(B).  In our opinion, Code § 16.1-269.1 addresses the prosecution and punishment of juveniles in as much detail as the similar Kentucky and Missouri statutes which are acknowledged in Stanford as sufficient to authorize those states to impose the death penalty upon juveniles 16 or 17 years of age.

Jackson also argues that imposition of the death penalty upon a 16-year-old juvenile constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  In Stanford, the Court stated, "[w]e discern neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age."  492 U.S. at 380.

And we discern no such consensus in Virginia, as evidenced by its statutes subjecting juveniles over the age of 14 to punishment as adults.  Code §§ 16.1-269.1, -272.  Therefore, we conclude that a 16-year-old person who is convicted of capital

murder may be subjected to capital punishment.

2.    Psychological evaluation under Code § 19.2-264.3:1(F)(1)

Pursuant to the provisions of Code § 19.2-264.3:1(E), Jackson gave notice of his intent to present psychological evidence on the issue of mitigation of punishment during the penalty phase of the trial.  In response, the Commonwealth requested the court to order Jackson to submit to a court-ordered examination by a psychologist designated by the court as provided in Code § 19.2-264.3:1(F)(1) in the following relevant language:

> If the attorney for the defendant gives notice
> pursuant to [Code § 19.2-264.3:1(E)] and the
> Commonwealth thereafter seeks an evaluation concerning
> the existence or absence of mitigating circumstances
> relating to the defendant's mental condition at the
> time of the offense, the court shall appoint one or
> more qualified experts to conduct such an evaluation.
> The court shall order the defendant to submit to such
> an evaluation, and advise the defendant on the record
> in court that a refusal to cooperate with the
> Commonwealth's expert could result in exclusion of the
> defendant's expert evidence.

The succeeding paragraph states in pertinent part:

> If the court finds . . . that the defendant has
> refused to cooperate with an evaluation requested by
> the Commonwealth, the court may admit evidence of such
> refusal or, in the discretion of the court, bar the
> defendant from presenting his expert evidence.

Code § 19.2-264.3:1(F)(2).

Over Jackson's objection, the court ordered him to submit to an evaluation by Dr. Nelson, a forensic psychologist,

31

appointed under the provisions of these statutes.  Jackson submitted to the evaluation.  Although Jackson, not the Commonwealth, called Dr. Nelson as a witness in his own behalf in the penalty phase of the trial, he complains that the court erred in several respects in ordering his evaluation by Dr. Nelson.

First, he contends that the evaluation should not have been ordered.  According to Jackson, the statute violated his Fifth Amendment rights against self-incrimination and his Sixth Amendment rights to a fair trial because the statute required him to cooperate with a court-appointed psychiatrist or suffer the possibility that his expert evidence would be barred.  We rejected similar contentions in Stewart v. Commonwealth, 245 Va. at 243-44, 427 S.E.2d at 407-08, and we apprehend no reason to modify our opinion on those issues.

Second, Jackson maintains that, in ordering the evaluation, the court failed to warn Jackson of the consequences of his failure to cooperate and ruled erroneously that Dr. Nelson could testify in the penalty phase even though Jackson never called his own expert on the issue of mitigation.  We do not consider either contention because Jackson called Dr. Nelson as his own witness.  A defendant in a criminal case cannot take advantage of an alleged error he has injected into the record.  Saunders v. Commonwealth, 211 Va. 399, 400, 177 S.E.2d 637, 638 (1970).

Nevertheless, Jackson claims that the court erroneously "allowed Dr. Nelson to offer an opinion on Jackson's future dangerousness," which was "an opinion on the ultimate issue of fact." We do not agree for two reasons.

First, Dr. Nelson merely testified as to the risk factors associated with violence that were exhibited in Jackson's personality and caused him to diagnose Jackson as suffering from an antisocial personality disorder. Dr. Nelson testified further that Jackson exhibited more of the risk factors for future violent acts "than many of the other [criminal] defendants I have evaluated." Dr. Nelson quantified neither the extent of those factors nor the probability of Jackson's future dangerousness and he did not opine that Jackson would be a danger in the future. Jackson recognizes this in his later argument that Dr. Nelson "could not say that Jackson would be a danger in the future."

Second, even if Dr. Nelson had expressed an opinion of Jackson's "future dangerousness," such evidence would not have constituted an opinion as to the ultimate issue in this case. That issue is whether Jackson should be sentenced to death or imprisoned for life. Payne v. Commonwealth, 233 Va. 460, 469-70, 357 S.E.2d 500, 506, cert. denied, 484 U.S. 933 (1987).

Accordingly, we reject all of Jackson's claims relating to his psychological evaluation and to Dr. Nelson's testimony.

33

3. Sufficiency of Evidence of Future Dangerousness

Since neither psychologist was willing to predict that Jackson would commit criminal acts of violence in the future, Jackson argues that the court erred in submitting this issue to the jury since it "could only arrive at a verdict by speculation and guesswork."  We disagree.

Expert opinion is not required on this issue if there is sufficient evidence to permit a lay person to conclude that an accused would commit criminal acts of violence in the future that would constitute a serious danger to society.  Indeed, we have held that a jury is entitled to disregard an expert's opinion that a defendant would not be dangerous in the future. Saunders v. Commonwealth, 242 Va. 107, 114-15, 406 S.E.2d 39, 43, cert. denied, 502 U.S. 944 (1991).  Rejecting Jackson's contentions, we conclude that there was sufficient evidence to permit a reasonable person to conclude beyond a reasonable doubt that Jackson would be dangerous in the future.

4. Instructions refused

Jackson contends the court erroneously refused two instructions he tendered, one of which would have told the jury that it "must consider a mitigating circumstance if you find there is evidence to support it" and the other that the jury was not required to fix the punishment at death even if the jury found "beyond a reasonable doubt, the existence of the

aggravating circumstance(s)."  The claim is that these theories were not covered by other instructions.

We disagree.  The only instruction granted in the penalty phase told the jury that if it found beyond a reasonable doubt that the Commonwealth proved future dangerousness, the jury may "fix the punishment of the defendant at death."  It further instructed the jury that "if you believe from all of the evidence that the death penalty is not justified," then the jury could fix Jackson's punishment at life imprisonment or life imprisonment and a fine.  Since both Jackson's theories were covered by these instructions, he is not entitled to have duplicative instructions on those theories.  See, e.g., Tuggle v. Commonwealth, 228 Va. 493, 508, 323 S.E.2d 539, 548 (1984), vacated and remanded on other grounds, 471 U.S. 1096 (1985), aff'd on remand, 230 Va. 99, 334 S.E.2d 838 (1985), cert. denied, 478 U.S. 1010 (1986).  Furthermore, we have held that instructions similar to those given by the court in this case "adequately stated the statutory framework and were sufficient." LeVasseur v. Commonwealth, 225 Va. 564, 595, 304 S.E.2d 644, 661 (1983), cert. denied, 464 U.S. 1063 (1984).  For these reasons, we find no error in the court's refusal of Jackson's tendered instructions.

VII.  SENTENCE REVIEW

35

Under Code § 17-110.1(C)(1) and (2), we are required to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor," and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

## A. Passion and Prejudice

Jackson does not contend that the sentence of death was imposed under any of the impermissible factors and our independent review of the entire record fails to reveal that the jury's death sentence "was imposed under the influence of passion, prejudice or any other arbitrary factor."  Code § 17-110.1(C)(1).

## B. Excessiveness and Proportionality

Jackson argues that a review of similar capital murder cases "would reflect the excessiveness and disproportionate punishment inflicted on this 16 year old defendant."  We disagree.

In our proportionality review, we have considered "whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993).  Our comparison of the

record in this case with the records in other capital murder cases, including those in which life sentences were imposed, fails to indicate that the death penalty imposed in this case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Code § 17-110.1(C)(2).

Since the jury based its death sentence solely on the "future dangerousness" predicate, we have given particular consideration to other capital murder cases in which robbery or attempted robbery was the underlying felony and the death penalty was based only on the "future dangerousness" predicate. Such cases were compiled in Yeatts v. Commonwealth, 242 Va. at 143, 410 S.E.2d at 267-68, and supplemented in Chichester, 248 Va. at 332-33, 448 S.E.2d at 652, and Roach v. Commonwealth, 251 Va. at 351, 468 S.E.2d at 113 (17-year-old defendant).

Our conclusion is that, while there are exceptions, juries in this Commonwealth generally impose the death sentence for crimes comparable to Jackson's murder of Bonney. Jackson killed Bonney in cold blood simply because Bonney had refused to comply with Jackson's demand for money. This killing demonstrates Jackson's lack of respect for human life.

Although Jackson was only 16 years old when he killed Bonney, his criminal conduct on other occasions, especially the violent acts he committed while (1) on probation, (2) free on

37

bond, and (3) in jail awaiting trial for these offenses, manifests an escalating pattern of violent criminal behavior that compels us to conclude that the imposition of the death penalty in his case is neither excessive nor disproportionate to the penalty imposed in similar cases.[6]

## VIII    CONCLUSION

We find no reversible error in the issues presented in this case.  After reviewing Jackson's sentence of death pursuant to Code § 17-110.1, we decline to commute the sentence of death. Therefore, we will affirm the judgments of the trial court.

Affirmed.

JUSTICE HASSELL, concurring in part and dissenting in part.

Code § 17-110.1(C)(2) requires this Court to consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

We have stated that "the test of proportionality is whether 'juries in this jurisdiction generally approve the supreme penalty for comparable or similar crimes.'"  Davidson v. Commonwealth, 244 Va. 129, 136, 419 S.E.2d 656, 660, cert. denied, 506 U.S. 959 (1992) (citing Smith v. Commonwealth, 239

---

[6] Unlike the dissent, in resolving the issues of excessiveness and proportionality, we did not limit our comparison to the records in cases in which the defendants were 16 years old when

Va. 243, 271, 389 S.E.2d 871, 886, <u>cert.</u> <u>denied</u>, 498 U.S. 881 (1990) (quoting <u>Stamper</u> v. <u>Commonwealth</u>, 220 Va. 260, 284, 257 S.E.2d 808, 824 (1979), <u>cert.</u> <u>denied</u>, 445 U.S. 972 (1980))). Juries in Virginia generally have not approved of the imposition of the death penalty for 16-year-old capital murder offenders.

Since 1987, ten 16-year-old offenders have been convicted of capital murder, and only one defendant, Chauncey J. Jackson, has been sentenced to death. I agree with the majority that Jackson's offenses are atrocious and that he has exhibited little, if any, regard for the value of human life or the consequences of his criminal conduct. However, my review of all capital murder cases involving 16-year-old offenders in Virginia leads me to the conclusion that the sentence of death imposed upon Jackson is excessive and disproportionate to penalties imposed in similar cases.

For example, in <u>Novak</u> v. <u>Commonwealth</u>, 20 Va. App. 373, 382, 457 S.E.2d 402, 406 (1995), a Virginia Beach jury refused to impose the penalty of death upon a 16-year-old defendant, Shawn Paul Novak, even though the jury convicted him of capital murder. The facts in <u>Novak</u> are more egregious than the facts in the present case. Novak killed two young boys, age 7 and age 9. The seven-year-old victim died from "three stab wounds which

---

the offenses were committed. Instead, we considered Jackson's age as one of many relevant factors.

39

would have been a quick three thrusts resulting in incapacitation and . . . repeated cutting and slashing of the neck until it was almost decapitated . . . ." The nine-year-old victim "had been killed by a 'blunt force injury' and 'multiple slashes' on his neck." Id. at 379-80, 457 S.E.2d at 405.

In Owens v. Commonwealth, No. 2259-95-1 (Va. Ct. App. Nov. *19, 1996), the defendant, Marvin T. Owens, was convicted of capital murder. Owens killed four persons, including a 14-year-old boy, by using a pistol to shoot each victim in the head. Just as Jackson, Owens had an extensive juvenile criminal history, including commitments to the Department of Youth and Family Services for the following criminal offenses: conspiracy to distribute cocaine, possession of cocaine with the intent to distribute, and possession of cocaine. The jury fixed Owens' punishment at life imprisonment.

The case of Reid v. Commonwealth, No. 1175-95-1 (Va. Ct. App. July 2, 1996), is very similar factually to the present case. There, the defendant, Dwayne M. Reid, then 16 years old, approached two males who were traveling in a truck in Suffolk. The men in the truck, Joseph Mehalko and Tommy Runyon, asked several young male pedestrians, including Reid, whether any of the pedestrians had "a twenty rock [of crack cocaine]." One of the pedestrians threw an item, about the size of a pebble, through a window into the truck, and Mehalko and Runyon,

40

thinking the item was a rock of crack cocaine, began to search for it. As Runyon retrieved some money from his wallet, Mehalko noticed "a gun come through the passenger side window." A struggle ensued, and Reid shot Runyon in the head. Runyon subsequently died as a result of the gunshot wound.

Reid had a prior criminal record, and he had been convicted of the following crimes: two counts of armed robbery and two different offenses of use of a firearm during the commission of robbery. At a bench trial, Reid was convicted of capital murder and sentenced to life imprisonment.

In Rea v. Commonwealth, 14 Va. App. 940, 941, 421 S.E.2d 464, 465 (1992), the defendant, Stephen Rea, was convicted, at a jury trial, of three separate counts of capital murder. Rea killed three persons, including a 17-year-old boy, by shooting them with a firearm. Rea had an extensive juvenile criminal history. He was arrested for petty larceny which was taken under advisement for six months. He was arrested and charged for disorderly conduct, vandalism, and "being a runaway," and he was convicted and placed on supervised probation. He was arrested for trespass, which was resolved at the juvenile intake. He was arrested for violation of his probation. He was subsequently arrested for breaking and entering, petty larceny, and grand larceny, and placed on house arrest and ordered to pay restitution. He was also arrested for eluding police, reckless

41

driving, and driving without a Virginia operator's license.  The

jury fixed Rea's punishment at life imprisonment for each of the

capital murder convictions.  See also Faulk v. Commonwealth, CR

95J2 and CR95J4 (Southhampton County Cir. Ct. Sept. 17, 1996)

(Defendant, 16 years of age at the time of the offenses, pled

guilty to capital murder in the commission of robbery, capital

murder in the commission of abduction, and robbery with a

weapon, and sentenced to life imprisonment.); Prostell v.

Commonwealth, No. J-1179 (Virginia Beach Cir. Ct. June 18, 1987)

(The 16-year-old defendant, whose criminal history included one

previous felony conviction as a juvenile, pled guilty to capital

murder and received life imprisonment.  The defendant killed the

victim after being advised by a co-defendant that the defendant

would receive $300 for the murder of the victim.  At the time of

the murder, the defendant was on probation after having been

found guilty of robbery.); Campbell v. Commonwealth, No. 5559

(Amherst County Cir. Ct. June 4, 1987) (The defendant was found

guilty at a bench trial of capital murder and certain other

related crimes.  The defendant, 16 years old at the date of this

offense, entered a pizza restaurant wearing a ski mask and armed

with a loaded 12-gauge shotgun, ordered the employees to the

floor, and shot a restaurant employee in the head, killing him.

The defendant was sentenced to life imprisonment.); Stewart v.

Commonwealth, No. 2928-97-1 (Va. Ct. App. July 7, 1997) (This

16-year-old defendant pled guilty in the Norfolk Circuit Court to capital murder and certain other related offenses and was sentenced to life without parole plus 18 years.  The defendant killed the victim with a pistol during an attempted robbery.). Tross v. Commonwealth, 21 Va. App. 362, 464 S.E.2d 523 (1995) (This 16-year-old defendant was convicted of capital murder, robbery, and using a firearm to commit murder and was sentenced to life imprisonment for the capital murder, 20 years' imprisonment for the robbery, and two years' imprisonment for the firearm charge.  His prior record included convictions for petit larceny and possession of a beeper/pager on school grounds.  He had been arrested and charged on two separate occasions for assault and battery, but those charges were nolle prossed.).

Shawn Novak, age 16, killed two young boys, but he was not sentenced to death.  Stephen Rea, age 16, killed three people, including a teenager, but he was not sentenced to death.  Marvin Owens, age 16, killed four persons, but he was not sentenced to death.  Dwayne Reid, who committed crimes substantially similar to Jackson's crimes, was not sentenced to death.  Upon comparison of Jackson's sentence of death, along with his criminal history and facts surrounding his case, to the facts and criminal histories of the other defendants who committed capital offenses at age 16, I can only conclude that Jackson's

sentence of death is both excessive and disproportionate in violation of Code § 17-110.1 (C)(2).

I would reduce Jackson's sentence of death to life imprisonment. In view of Jackson's sentences for his other convictions, he would remain incarcerated for the remainder of his natural life.